## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

In the Matter of: }
 }
MARK ANDREW DENNIS and }  CASE NO. 10-81244-JAC-7
TAMMY M. DENNIS a/k/a }
TAMMY McCOWAN DENNIS }  CHAPTER 7
    Debtors }

            }
BANKSTON MOTOR HOMES, INC. }  A.P. No. 10-80097-JAC-7
            }
    Plaintiff }
  v. }
            }
MARK ANDREW DENNIS }
            }
    Defendant }

## MEMORANDUM OPINION

On February 15, 2011, this Court held a trial in the above styled adversary proceeding. At the conclusion of the trial, the Court dictated its ruling into the record in open court granting judgment in favor of the plaintiff, Bankston Motor Homes, pursuant to 11 U.S.C. §§ 523(a)(2), (4) and (6). This opinion supplements the findings of facts and conclusions of law dictated into the record in open court.

## I. BACKGROUND

1. On March 29, 2010, Mark and Tammy Dennis filed for relief under Chapter 7 of the Bankruptcy Code. On Schedule F - Creditors Holding Unsecured Nonpriority Claims, the debtors listed a debt owed to Bankston Motor Homes, Inc. in the amount of $102,062.35 for

"excess compensation."  The debtors did not list the debt as being contingent, unliquidated or disputed.

2.     On October 4, 2010,  Bankston Motor Homes filed this adversary proceeding alleging that the debt of Mark Dennis ("Dennis") is nondischargeable as: (1) a debt under § 523(a)(2)(A) "for money . . . to the extent obtained by . . . false pretenses, a false representation, or actual fraud . . . .;" (2)  a debt under § 523(a)(4) for "larceny;" and (3) a debt under § 523(a)(6) "for willful and malicious injury by the debtor to another entity or to the property of another entity."   Bankston Motor Homes asserts that for the years 2006, 2007, and two months during 2008, Dennis caused himself to be overpaid in the total amount of $130,191.  Based on an oral agreement between the parties that Dennis would earn at least $150,000 per year, Bankston Motor Homes only seeks a determination that $102,062 of the total overcompensation is nondischargeable.

3.     Bankston Motor Homes employed Dennis from 1998 until 2004 as a salesman.   In March of 2005, the debtor returned to work for Bankston Motor Homes as the sales manager for each of the companies five locations.  As sales manager, the debtor managed the operation of the company's sales team and continued to sell recreational vehicles.

4.     On March 21, 2005, the parties executed an employment agreement and covenant not to compete.  According to the terms of the employment agreement, Bankston Motor Homes agreed to pay Dennis a monthly salary of $6,500, plus additional incentives.  *See* Defendant's Ex. 12.   At trial it was undisputed that Bankston Motor Homes did not pay Dennis pursuant to the terms of his employment agreement.  Rather, Bankston Motor Homes paid Dennis in accordance with the terms of an oral agreement Dennis entered into with the

owner of the company, Harrison Bankston ("Bankston"). Pursuant to the terms of the oral agreement, Bankston Motor Homes paid Dennis a base salary of $1,500 per week, commissions for each vehicle he personally sold, plus incentive pay which roughly equaled 1% of Bankston Motor Homes's monthly adjusted gross profit.

5.      In September of 2006, Bankston Motor Homes promoted Dennis to general manager. While Dennis suggested at trial that he discussed a change in compensation with Harrison Bankston to increase the rate of his incentive pay after receiving the promotion, Bankston testified that the debtor's pay did not change with the promotion. This point was not further developed at trial and is not necessary for the Court's determination. Regardless of whether or not Bankston Motor Homes agreed to increase the debtor's rate of incentive pay following the promotion, the heart of the controversy in this case is whether or not Dennis caused himself to be overpaid by falsely presenting inflated payment requests to the company's payroll clerk which exceeded the amounts authorized by Bankston.

6.      Dennis was in charge of calculating his own commission and incentive payments, as well as commission and incentive payments for all other employees. Each month Dennis made the commission and incentive payment calculations and then met with Bankston for Bankston's review and approval of same. Dennis generated a Commission Analysis report for each employee, including one for himself. Dennis handwrote and added the amount of incentive pay due to him on the bottom of the commission report. After discussing and reviewing same with Dennis, Bankston initialed and dated each report indicating his approval of same.

7.      Bankston testified that he had assumed that Dennis then took the initialed reports to the payroll clerk for processing. Instead, the company's former payroll clerk, Lisa Adams ("Adams"), testified that throughout 2006 and 2007, Dennis brought her handwritten notes with the total commission and incentive payments due each employee, including himself.[1]

8.      At some point in late 2007, Bankston testified that Adams expressed concerns to him that Dennis was being overcompensated. It was then, Bankston testified, that he learned that Dennis was submitting a handwritten note each month to Adams with the commission and incentive payments for processing rather than the Commission Analysis reports that Bankston reviewed with Dennis and approved by initialing same. Bankston instructed Adams to only issue payments thereafter based on the Commission Analysis reports that he initialed. It is apparent that Bankston relied on Dennis and gave him a great deal of responsibility at least prior to the time Adams made her suspicions known. Bankston testified that during this time he was caring for his wife who had cancer and was traveling with her out of state for treatments. Nevertheless, when he was not available to review the Commission Analysis reports in his office, Dennis would fax same to him for review and they would discuss same over the phone.

9.      Dennis testified that the method of payment never actually changed. He insists that each month, after his one on one meetings with Bankston, he took all the company commission reports, initialed by himself and Bankston, to Adams who then issued the monthly

---

[1]      Bankston Motor Homes terminated Adams in March of 2010 for undisclosed reasons.

commission and incentive checks for all employees based on the reports. In support of his argument, Dennis submitted a few Commission Analysis reports generated for the company's Nashville office on which Dennis's initials appear in addition to those of Bankston. Dennis never explained however why the amount listed as due to him on the handwritten notes submitted to Adams for payment exceeded the amounts actually owed Dennis.

10. Dennis's testimony is in direct conflict with that of Bankston and Adams. Adams testified that throughout 2006 and 2007 Dennis did not submit to her the Commission Analysis reports initialed by Bankston. While Adams was unclear as to the exact date Dennis finally began submitting the initialed reports to her, Adams's testimony was very clear that Dennis did not submit the initialed reports until after she began requiring same as instructed by Bankston in either late 2007 or early 2008. Bankston testified that the new procedure worked for a while until it was discovered that on two occasions in 2008, after Dennis first submitted accurate commission and incentive payment calculations for himself to Bankston for approval, Dennis caused himself to be overcompensated by submitting altered Commission Analysis reports to the payroll clerk with Bankston's forged signature on same.

11. At some point in 2008, Bankston instructed Adams to perform an audit of Bankston Motor Homes records to determine the amount of commission payments that were earned by Dennis over the course of 2006, 2007, and 2008 as compared to the amount actually paid. To do this, Adams testified that she went into Dennis's office desk to retrieve any relevant documents and made photo copies of same. Using the documents retrieved from Dennis's desk and other company records, Adams generated reports that revealed Dennis was

overcompensated in 2006 by $55,705, in 2007 by $66,486, and in 2008 by $8,000 for total overcompensation of $130,191. *See* Plaintiff's Ex. 1 - 4. Included in the documents retrieved by Adams were handwritten notes from Dennis for the months of June 2006, August 2006, February 2007, March 2007, June 2007, July 2007, August, 2007, September 2007, October 2007, and November of 2007. *See* Plaintiff's Ex. 2-3. In each instance, the amount submitted by Dennis to Adams for payment exceeded the amount that he was actually due for the month. For the months during 2006 and 2007 in which Adams was not able to retrieve Dennis's handwritten notes that he submitted requesting payment, Adams was able to calculate from other company records the amounts Dennis was actually due versus the amount paid. Dennis was consistently overpaid throughout 2006 and 2007. Adams also retrieved two documents for the sales months of February and March of 2008. The documents were Commision Analysis reports submitted to Adams for payment under the new procedure implemented by Bankston for payment requiring his signature. The reports for the sales months of February and March 2008 were forged and exceeded the amount actually approved by Bankston by $8,000. See Plaintiff's Ex. 4.

12. After the audit, Bankston confronted Dennis in June or July of 2008. Bankston testified that Dennis admitted to wrongdoing in this meeting and apologized. Surprisingly, Bankston did not terminate Dennis at this meeting. Bankston explained that he and Dennis were members of the same church and Dennis promised to pay him back.

13. Dennis finally resigned in early 2009 after obtaining new employment. During an exit interview conducted by Bankston and a consultant, Hardee McAlhaney, Bankston testified that he confronted Dennis with evidence of the overpayments. Bankston testified that

Dennis admitted to the overpayment and promised to repay the money owed. Subsequently on March 2, 2009, Bankston testified that Dennis returned to his office and gave him seven dollars telling him that the money was all he had at the time but promised to begin making payments.

14.    Hardee McAlhaney testified that he was present at the exit interview and stated that Dennis immediately admitted that he was overpaid and fully intended to make restitution.

15.    Dennis denies the issue of his overpayment was mentioned at the exit interview.   He also denies returning to Bankston's office and paying him seven dollars with the promise to make future payments.

## II. CONCLUSIONS OF LAW

### 11 U.S.C. § 523(a)(2)(A)

Bankston Motor Homes has the burden of proving each element of this § 523 action by a preponderance of the evidence.[2]   Section 523(a)(2)(A) excepts from discharge any debt–

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.][3]

The Supreme Court in *Field v. Mans*, 516 U.S. 59 (1995) held that the "operative terms in §523(a)(2)(A), 'false pretenses, a false representation, or actual fraud," are terms of art that carry

---

[2]    *Grogan v. Garner*, 498 U.S. 279 (1991).

[3]    11 U.S.C. §523(a)(2)(A).

with them "the elements that the common law has defined them to include."[4]   Under § 523(a)(2)(A),

Bankston Motor Homes must establish that: (1) the debtor made a false representation with intent

to deceive; (2) Bankston Motor Homes relied on the misrepresentation; (3) the reliance was justified;

and (4) Bankston Motor Homes sustained a loss as a result of the misrepresentation.[5]

### A.  False representation made with intent to deceive.

Although the debtor argues that after each monthly meeting held with Bankston that he took

all company commission reports, initialed by himself and Bankston, to the payroll clerk and denies

having ever altered, changed or modified any commission report for himself after it had been

approved by Bankston, the Court finds after considering the demeanor of each of the witnesses and

the documents submitted by the parties, that the debtor did indeed make false representations to

Bankston Motor Homes with the intent to deceive.   Intent is a subjective issue requiring the Court

to examine the totality of the circumstances.[6]   The proper focus for determining whether the debtor

made a false representation with deceptive intent is whether he intended under the totality of the

circumstances to use false pretenses or a false representation for the purpose of obtaining excess

compensation.[7]   Although the debtor denies any wrongdoing, the Court believes that the evidence

is overwhelming that the debtor caused himself to be overpaid by representing to Bankston Motor

Homes that the handwritten calculations that he brought to Adams for payment throughout 2006 and

---

[4]   *Field v. Mans*, 516 U.S. at 69.

[5]   *SEC v. Bilzerian (In re Bilzerian),*153 F.3d 1278 (11th Cir. 1998); *In re Wood*, 245 Fed. Appx. 916, 917-18 (11th Cir. 2007).

[6]   *Avis Rent A Car Sys., Inc. v. Maxwell (In re Maxwell)*, 334 B.R. 736, 742 (M.D. Fla. 2005)*, Home Loan Corp. v. Hall (In re Hall)*, 342 B.R. 653, 656 (Bankr. M.D. Fla. 2006).

[7]   *SunTrust Bank v. Brandon (In re Brandon),* 297 B.R. 308 (Bankr. S.D. Ga. 2002).

2007 were accurate. Although the handwritten notes could not be obtained for each month in question, enough were retrieved to demonstrate a clear pattern of deception. Moreover, the Court takes note that one of the plaintiff's key witnesses, Adams, was terminated by the plaintiff in March of 2010. As Adams was no longer an employee of Bankston Motor Homes she clearly had no reason to exaggerate her testimony on behalf of the plaintiff. Yet, Adams testified decisively that Dennis presented her with handwritten notes throughout 2006 and 2007 which caused his overpayment. Further, the Court notes that Dennis included the debt on his petition and did not list same as disputed, contingent or unliquidated. Finally, the Court finds the testimony of Bankston and Hardee McAlhaney to be credible in that both testified that Dennis immediately admitted during his exit interview after presented with the documentation of his overpayment that he was overpaid and promised to repay Bankston Motor Homes.

### B. Justifiable Reliance

In *Field v. Mans*, 516 U.S. 59 (1995), the Supreme Court determined that the applicable standard of reliance that a creditor must establish under § 523(a)(2)(A) is justifiable reliance rather than the rigid standard of reasonable reliance. In *Vann v. City Bank & Trust Co. (In re Vann)*, 67 F.2d 277 (11th Cir. 1995), the Eleventh Circuit stated that under the justifiable reliance standard the "plaintiff's conduct must not be so utterly unreasonable, in the light of the information apparent to him, that the law may properly say that his loss is his own responsibility." In this case, the Court finds that Bankston Motor Homes's reliance was both justified and reasonable under the circumstances of this case. Initially, the Court notes that we are not talking about a sophisticated lender or bank, but rather a small owned business. Further, Dennis was a trusted employee who had worked for the business first from 1998 through 2004 as a salesman and then returning to a position

with greater authority in 2005. Dennis was also a member of Bankston's church. Bankston's trust, while obviously misguided in retrospect, was certainly understandable at the time given the parties' relationship and history. Finally, the Court notes that Dennis, the general manager of the entire company, was giving the false payment information to a payroll clerk who was certainly in no position to question her superior. Accordingly, the Court finds that Bankston Motor Homes relied upon Dennis's false representations and that the reliance was both justified and reasonable under the circumstances.

Finally, the Court finds that Bankston Motor Homes clearly sustained a loss as a result of Dennis's false representations. Accordingly, the debt owed to the plaintiff, Bankston Motor Homes, by the defendant, Mark Dennis, in the amount of $102,062 is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

### 11 U.S.C. §§ 523(a)(4) and (6)

The Court further finds that the debt is nondischargeable pursuant to 11 U.S.C. §523(a)(6) as a debt obtained by willful and malicious injury. Under § 523(a)(6) a "willful and malicious injury by the debtor to another entity or to the property of another entity" is excluded from discharge. "[A] debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury."[8] When a debtor commits an act that is "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will" malice is implied.[9] Here the Court finds that Dennis committed

---

[8]    *Thomas v. Loveless (In re Thomas),* 288 Fed. Appx. 547 (11th Cir. 2008).

[9]    *Id.*

an intentional act or acts the purpose of which was to cause injury or which was substantially certain to cause injury to Bankston Motor Homes. The acts committed by Dennis which caused his overpayment were wrongful and without just cause so malice is implied and the debt is nondischargeable pursuant to § 523(a)(6).

Finally, the Court finds that the debt is nondischargeable pursuant to § 523(a)(4) as a debt for larceny. Section 523(a)(4) of the Bankruptcy Code excepts from discharge a debt for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." To determine whether a debt is nondischargeable for larceny under § 523(a)(4) courts have applied the federal common law definition under which the term larceny is defined as "the fraudulent taking and carrying away [of] property of another with intent to convert such property to the taker's use without the consent of the owner."[10] Here the funds obtained by Dennis were not lawfully obtained. The funds were falsely converted without the consent of Bankston Motor Homes. Accordingly, the Court finds that the funds were obtained by larceny and are nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

A separate order in accordance with this opinion will be entered.

Dated: February 17, 2011

/s/ Jack Caddell
Jack Caddell
U.S. Bankruptcy Judge

---

[10]    *In re Shreve*, 386 B.R. 602, 606 (Bankr. W.D. Va. 2008).